# NO. 12-23-00208-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *CHRISTOPHER NELSON HOOD, APPELLANT* | *§* | *APPEAL FROM THE 173RD* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS, APPELLEE* | *§* | *HENDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Christopher Nelson Hood appeals his conviction for murder.  In one issue, he argues that the evidence is insufficient to support the trial court's judgment.  We affirm.

## BACKGROUND

During a historic winter storm, on February 18, 2021, Appellant and his girlfriend, Brooke Spurgeon, lived in a small apartment complex in Seven Points, Texas.  Their daughter was born just weeks earlier on January 1, 2021.

Appellant drove his father's truck to a local store but had a collision on his way home, which damaged the truck.  One neighbor noted that Spurgeon appeared to be upset with Appellant due to the wreck. Other neighbors observed Appellant and Spurgeon arguing on prior occasions. The couple hosted one of their neighbors for dinner that evening.  The neighbor noticed that there

appeared to be "tension in the air" after Spurgeon served her first rather than Appellant. The neighbor subsequently returned to her apartment.

Shortly thereafter, according to Appellant, Spurgeon became upset with him because he mentioned that another woman, who flirted with Appellant in the past, would travel to their apartment for a visit. In response, Appellant claims that Spurgeon retrieved a .357 magnum revolver and pointed it downward at the floor beside her.[1] According to Appellant, he told Spurgeon that he only teased that the other woman would come to their apartment, and urged Spurgeon to put the handgun away, but when she refused, he stood up and approached her. Appellant maintains that as he attempted to retrieve the revolver from Spurgeon, he grabbed her hand and arm, which became outstretched, resulting in the revolver's being pointed at him. He claimed that while twisting the handgun to loosen Spurgeon's grip on it, it "went off," and the round struck her just below her forehead, near the nasal and orbital region on the left side of her face. Spurgeon clung to life for approximately one hour but ultimately succumbed to her injuries.

Appellant claimed the shooting was accidental, but he ultimately was indicted for the offense of murder.[2] The indictment also contained an enhancement allegation paragraph, which elevated the minimum range of punishment from five years to fifteen years due to an alleged prior conviction.[3] Appellant waived his right to a jury trial, and the State agreed to cap the maximum sentence he could receive at fifty years for the murder charge. Appellant pleaded "not guilty" to the offense, and the matter proceeded to a bench trial. The trial court ultimately found Appellant "guilty" of the offense of murder. After a sentencing hearing, the trial court sentenced Appellant to imprisonment for fifty years. This appeal followed.

## EVIDENTIARY SUFFICIENCY

In his sole issue, Appellant argues that the evidence is insufficient to support the trial court's judgment because the State failed to prove beyond a reasonable doubt that Appellant

---

[1] Appellant claimed that he obtained the firearm for Spurgeon to keep for her protection.

[2] Appellant also was indicted in Count 2 for unlawful possession of a firearm by a felon. *See* TEX. PENAL CODE ANN. § 46.04 (West Supp. 2023). He ultimately pleaded "guilty" to this offense, and the trial court sentenced him to imprisonment for ten years with that sentence ordered to run concurrently with the murder conviction that is the subject of this case. He does not appeal the judgment for Count 2.

[3] *See* TEX. PENAL CODE ANN. § 12.41(c)(1) (West 2019). Appellant later pleaded "true" to the enhancement allegations.

intended to cause Spurgeon's death and failed to disprove beyond a reasonable doubt that Spurgeon died as the result of an accidental shooting.

**Standard of Review**

In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). This standard recognizes the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)

The factfinder is also the sole judge of the credibility of the witnesses and the weight to be given their testimony and may believe all of a witness's testimony, portions of it, or none of it. *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). We give almost complete deference to a factfinder's decision when that determination is based on an evaluation of credibility. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). The reviewing court may not substitute its judgment for that of the factfinder. *Brooks*, 323 S.W.3d at 899; *see Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999) (stating appellate court may not sit as thirteenth juror and substitute its judgment for factfinder by re-evaluating weight and credibility of evidence).

In our review, we consider events occurring before, during, and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act. *Hooper*, 214 S.W.3d at 13. It is not required that each fact point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13. We consider all the evidence admitted at trial, even improperly admitted evidence. *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

For evidence to be sufficient, the state need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt. *See Wise v. State*, 364 S.W.3d 900,

3

903 (Tex. Crim. App. 2012). Rather, we consider whether inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Id.* The factfinder is permitted to draw multiple, reasonable inferences as long as each inference is supported by the evidence presented at trial. *See Hooper*, 214 S.W.3d at 15. In drawing reasonable inferences, the factfinder may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life. *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)).

The sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

## Applicable Law

The Texas Penal Code provides that a person commits murder if the person intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b) (West Supp. 2023). A person acts "intentionally" with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct. *Id.* § 6.03(a) (West 2021). With respect to the *nature* of his conduct, a person acts "knowingly" when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b). With respect to a *result* of his conduct, a person acts "knowingly" when he is aware that his conduct is reasonably certain to cause the result. *Id.*

Intent to kill is a question of fact for the factfinder. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). A jury may infer intent from the acts, conduct, and remarks of the accused, along with the surrounding circumstances. *Isassi v. State*, 330 S.W.3d 633, 643 (Tex. Crim. App. 2010). Intent need not be proven by direct evidence. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). On the contrary, "[i]ntent is almost always proven by circumstantial evidence." *Trevino v. State*, 228 S.W.3d 729, 736 (Tex. App.—Corpus Christi 2006, pet. ref'd); *see also Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (noting that proof of culpable mental state almost always relies upon circumstantial evidence).

4

These same rules apply to other culpable mental states—such as acting with knowledge. *See **Gant v. State***, 278 S.W.3d 836, 839 (Tex. App.—Houston [14th Dist.] 2009, no pet.). As long as the factfinder's finding of a culpable intent is supported by a reasonable inference, it is within its province to choose which inference is most reasonable. ***Isassi***, 330 S.W.3d at 643.

The factfinder may also infer intent from the method of committing the crime and from the nature of wounds inflicted on the victim. ***Manrique v. State***, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999). For example, the intent to kill may be inferred from the use of a deadly weapon in a deadly manner. ***Adanandus v. State***, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993); ***Watkins v. State***, 333 S.W.3d 771, 781 (Tex. App.—Waco 2010, pet. ref'd); *see **Bell v. State***, 501 S.W.2d 137, 138 (Tex. Crim. App. 1973). If the defendant uses a deadly weapon in a deadly manner, the inference of intent to kill is almost conclusive. ***Adanandus***, 866 S.W.2d at 215; ***Watkins***, 333 S.W.3d at 781; ***Trevino***, 228 S.W.3d at 736. When a deadly weapon is fired at close range and death results, the law presumes an intent to kill. ***Womble v. State***, 618 S.W.2d 59, 64-65 (Tex. Crim. App. 1981); ***Trevino***, 228 S.W.3d at 736.

"Accident" is not a defense to murder under Texas law. *Id.* at 229; *see **Williams v. State***, 630 S.W.2d 640, 644 (Tex. Crim. App. 1982). Rather, the question of accident goes to the issue of whether the conduct was voluntary. ***Adanandus***, 866 S.W.2d at 230; *see **Brown v. State***, 955 S.W.2d 276, 280 (Tex. Crim. App. 1997). Voluntariness and the mental state behind one's conduct are separate issues. ***Whatley v. State***, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014) (citing ***Adanandus***, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993)).

The Texas Penal Code requires that an act must be voluntary to establish guilt. *See* TEX. PENAL CODE ANN. § 6.01(a) (West 2021). When the existence of an accident is raised at trial, the factfinder must find beyond a reasonable doubt that the defendant voluntarily engaged in the conduct in which he is accused. *See **Williams***, 630 S.W.2d at 644.

"'Voluntariness,' within the meaning of Section 6.01(a), refers only to one's own physical body movements." ***Whatley v. State***, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014) (quoting ***Rogers v. State***, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003)). "If those physical movements are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis, or other nonvolitional impetus, that movement is not voluntary." *Id.* (quoting ***Rogers***, 105 S.W.3d at 638).

Conduct is not rendered involuntary merely because an accused does not intend the result of his conduct.  See *Adanandus*, 866 S.W.2d at 230.  If the accused engages in a voluntary act and has the requisite mental state, his conduct is not rendered involuntary simply because the conduct also included an involuntary act or because the accused did not intend the result of his conduct. See *Cruz v. State*, 838 S.W.2d 682, 686 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd); *Owens v. State*, 786 S.W.2d 805, 809 (Tex. App.—Fort Worth 1990, pet. ref'd).  Furthermore, the "voluntary act" requirement does not necessarily go to the ultimate act (e.g., pulling the trigger), but means only that criminal responsibility for the harm must include an act that is voluntary, e.g., pointing the gun.  See, e.g., *Mims v. State*, No. 12–02–00178–CR, 2004 WL 949453, at \*7 (Tex. App.—Tyler Apr. 30, 2004, pet. ref'd) (mem. op., not designated for publication) (citing *Rogers*, 105 S.W.3d at 638).  Finally, evidence of a struggle does not necessarily negate deliberate or voluntary conduct.  See *Adanandus*, 866 S.W.2d at 216, 230.

## Evidence at Trial

Appellant argues that the evidence is insufficient to show that he intended to cause Spurgeon's death and the State failed to disprove that Spurgeon died as the result of an accidental shooting.  The indictment alleged that Appellant committed the offense of murder by intentionally or knowingly causing the death of Spurgeon by shooting her with a firearm.[4]  The trial court ultimately found Appellant "guilty" of the offense.  See TEX. PENAL CODE ANN. § 19.02(b)(1).

At trial, Crystal Barina, who lived in a neighboring apartment, testified that she interacted with Spurgeon earlier on the day of the shooting, that she seemed happy, and there was no indication to her that there was any sort of disagreement between Appellant and Spurgeon.  Barina later knocked on their apartment door to borrow something.  After knocking on the door for what she described as twenty to thirty seconds, she heard a loud "boom" that she believed may have been a gunshot.  She retreated to her apartment, secured her children, called another neighbor, and returned to Appellant and Spurgeon's apartment.  She knocked again, but Appellant yelled from inside, "Nobody's home!"

---

[4] The indictment also alternatively alleged that Appellant intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Spurgeon's death by shooting her with a firearm. *See* TEX. PENAL CODE ANN. § 19.02(b)(2) (West Supp. 2023).  However, the trial court found that Appellant intentionally or knowingly caused Spurgeon's death by shooting her with a firearm and made no finding on the alternative allegation. *See id.* § 19.02(b)(1).  Furthermore, on appeal, Appellant challenges only the trial court's finding that he intentionally or knowingly caused her death by shooting her with a firearm.  Consequently, we do not address whether the evidence was sufficient under the alternative method and means of committing the offense.

6

Alyssa and Wesley Westbrook lived in the apartment directly above Appellant and Spurgeon. Alyssa testified that she heard the couple arguing earlier in the day because Appellant wrecked the truck. Later, she heard the gunshot, went outside, and heard Appellant saying, "Breathe, Brooke, breathe." In a statement Alyssa made shortly after the shooting, she said that she heard Appellant saying, "I'm sorry, babe. I'm so sorry." She also testified that she heard them argue on a few other occasions before the day of the shooting.

Alyssa's husband, Wesley, testified that he saw Brooke and Appellant yelling back and forth at each other earlier in the day as well. He also heard the gunshot but did not know what it was at the time. He testified that when he went outside and asked what was going on, he saw Appellant run out of his apartment where he exclaimed, "Oh fuck," before he ran back inside. He also testified that he observed Appellant and Brooke arguing and yelling at each other occasionally before the day of the shooting.

William Johnson, an upstairs neighbor, testified that he heard "loud arguing" from Appellant and Brooke's apartment that day while he was outside smoking with Alyssa. He testified that Alyssa asked him whether she should call law enforcement to do a wellness check on them. He recalled that he told her it might not be a bad idea. He stated he later heard a noise he described as an "extremely loud thud," after which he saw Appellant come out of his apartment, pace back and forth for a couple of minutes while repeatedly using the "F-word," and saying, "What did I do?" He also testified that he heard arguing below his apartment on prior occasions, but it was not a constant occurrence. He further stated that he previously had observed Appellant in the parking lot yelling at Brooke a couple of times. He testified that Appellant was usually the dominant person in those disagreements.

Similarly, Keelie Austin, another neighbor, heard a loud "pop" on the night in question. She testified that she heard yelling after that but said that was "something you heard daily." She said that Appellant was "constantly causing [a] ruckus outside." She explained that she would hear him

> yelling or banging on stuff at all hours . . . . He would hit on the truck and yell. He and his dad would get into it sometimes outside. That would be whenever his dad would give up and just go back inside and [Appellant] would be outside still mumbling or talking to himself, pacing.

7

Finally, another neighbor, Christine Powell, testified that she often "hung out" with Spurgeon. She said that she stayed at a hotel for two days due to the winter storm but came back every day to "check on Brooke." Powell testified that she ate dinner with the pair that night and stayed for a couple of hours. She further testified that she left because Appellant seemed "a little agitated," and she felt there was tension in the air coming from him. Powell said that Appellant's agitation seemed to be over her having been served her food first. Powell stated that it did not seem like a "big deal" to her. However, she said Spurgeon seemed embarrassed and seemed to be trying to keep the situation from escalating. According to Powell, she then decided it would be a good idea to return to her apartment and finish her meal there. She testified that Spurgeon walked her back to her apartment and stood in the doorway with her for a short period before she left, telling Powell she would return in a little while. Powell testified that after Spurgeon left, she heard what she thought was a transformer blowing and saw Appellant run out of the apartment in a panicky state and yelling, "Breathe, Brooke, breathe!" before he went back into the apartment, slammed the door, and locked it.

Appellant called his mother immediately after the shooting and told her, "Mom, I shot Brooke." She told him to call 9-1-1, and he complied. Appellant told the dispatcher that he needed an ambulance "asap" because "there's been an accident." He said "she's still breathing. I need y'all to hurry." He provided a partial address, but apparently the dispatcher was unable to immediately decipher Appellant's location. At that time, he did not mention a shooting or provide any other details about the incident, although Spurgeon's labored breathing, moaning, and gurgling can be heard on the recording of the 9-1-1 call, which was admitted into evidence.

Although the call still was connected, it is apparent that Appellant was away from the phone for almost eight minutes. The dispatcher attempted to tell him to remain on the line for medical assistance instructions, but Appellant abandoned the call to tend to Spurgeon. Meanwhile, the dispatcher patched in medical personnel on the call to provide Appellant instructions as to how to assist her. The dispatcher also attempted to "ping" the location of Appellant's cellular phone. In the background, Appellant can be heard pleading with Spurgeon not to die and to keep breathing, telling her, "We got the baby." He encouraged her numerous times to breath, and clapping sounds later determined to be slaps are heard as Appellant said, "Don't you dare die on me[,] ok?"

Appellant eventually returned to the call and provided the full address to the apartment for the first time. One dispatcher asked Appellant exactly what happened, to which Appellant replied,

"She was arguing and fighting . . . she went in and . . . [unintelligible] . . . . I don't know what happened. She went in and goes . . . she was just playing and she didn't mean to do it." He then stated to the dispatcher that "she shot herself right in the forehead." Less than thirty-seconds later, another dispatch intake call appeared on the line. The call was from Appellant's aunt, who stated, "My nephew just called my sister, his mother, and he said he shot his girlfriend." Meanwhile, on the other call, Appellant stated, "She's got a bullet in her forehead . . . . I don't know how she did it. She was acting like she was playing . . . and it just went off [.]"

Almost twenty minutes after Appellant made the 9-1-1 call, Seven Points Police Department Officer Jeremy McCoy arrived at the scene.[5] The video from his body camera showed Spurgeon lying in the dining area in a large pool of blood, immobile and unconscious, yet alive and moaning in agony. Appellant was hunched over Spurgeon providing care to her. The video also showed their infant on the nearby sofa. Officer McCoy asked Appellant what happened, and he responded, "We got in a[n] argument and next thing I know she's . . . she got that pistol and . . . [unintelligible] . . . next thing I know, she . . . she . . . I said, 'Don't you—I said put the . . . down,' and she . . . [Appellant stopped talking and made gestures like shrugging as if to signal "I don't know"] . . . and . . . that . . . that's . . . that's about . . . ." Appellant continued, "She was mad at me. She didn't mean to do it; I know she didn't." Officer McCoy asked, "So, she had the pistol, she shot herself?" Appellant responded, "She was just – she was just playing." Another officer arrived and secured the revolver, which was on the floor next to the left side of Spurgeon's body. Other first responders arrived and provided emergency care to Spurgeon and transported her to a nearby hospital, where she died. Medical personnel at the hospital could not find an exit wound and noted that Spurgeon's skull "moved" abnormally.

Appellant was placed in flex cuffs and transported to the county jail. He did not resist arrest or attempt to escape, and he followed the officers' instructions. Officers discovered an unspent .357 magnum bullet in Appellant's pocket that matched the others found in the revolver at the scene, including the single, spent casing from the shooting in the chamber of the revolver.

Early the next morning, Appellant called his mother from jail. A recording of the call was admitted into evidence. She asked Appellant, "What happened?" He responded, "An accident; I don't know mama." She asked, "Why did you have it out?" Appellant replied, "I don't know. I

---

[5] Officer McCoy died unexpectedly prior to trial and did not testify. However, his body camera recorded the scene and his observations, and the trial court admitted the recording into evidence.

don't know mama." She then said, "I don't understand, Chris; I don't understand." Appellant then told her that "[Spurgeon] ran into the room and came back out and had that [presumably, the gun] . . . I don't know; it was just a stupid argument. She was mad about Sarah." Appellant's mother queried, "Why was she mad about Sarah? Sarah's in jail. Why was she mad about Sarah? Answer me honestly. Y'all were over there doing drugs, weren't you?"[6] Before concluding the call, Appellant's mother stated, "Now here's another baby that don't got a mama," referring to Appellant's adult daughter who was killed in a car crash, leaving behind Appellant's two grandchildren.

Officials at the Seven Points Police Department contacted Texas Ranger Michael Adcock to assist in the investigation. He was unable to travel to the scene on the night of the incident due to an illness and the winter storm. However, he later reviewed the crime scene and evidence. He also interviewed Appellant, and the recording of the interview was admitted into evidence.

During the interview, Appellant described his relationship with Spurgeon. He said they "hardly ever fought" and were together all the time, describing them as each other's best friend. He denied there was any physical abuse between them or that he had an "anger issue" with her. He then admitted that they sometimes argued. However, he recanted and later claimed, "You can ask anybody; we never argued." He also stated they argued by "picking at each other," but they really "didn't get mad." Appellant admitted during the interview that sometimes he and Spurgeon used methamphetamine, then seemed to clarify that it was Spurgeon who used methamphetamine and he was more of an alcoholic. He said Spurgeon was a "good girl, [but] she just had some problems." He also indicated that he wished that he was the one who was killed that night.

Ranger Adcock then asked Appellant to describe the events leading up to the shooting. Appellant said that an acquaintance named Sarah contacted them through Facebook about wanting to come to their apartment, and Spurgeon became angry. He explained that Spurgeon did not like Sarah because Sarah "was a flirty type of person," and Spurgeon was a "little bit jealous." Appellant said he thought it was "funny" that Spurgeon got mad, so he started "nagging at her" about it. In his mind, he was having fun and joking with her. He said that Spurgeon became

---

[6] Appellant's mother and aunt both believed that after their baby was born, both Appellant and Spurgeon appeared to be under the influence of drugs at times. Although the post-mortem toxicology report showed the presence of methamphetamine in Spurgeon's blood, no testing or evidence was admitted at trial showing that Appellant was under the influence of drugs at the time of the shooting.

increasingly irate, went into the bedroom, and retrieved the gun. He reported that Spurgeon said to him, "I mean it; you better not have that bitch coming here." Appellant claimed he had no idea what was going through Spurgeon's mind that made her go get the gun.

According to Appellant, he responded calmly and quietly, "Baby, go put that gun back up." He said that Spurgeon was "steadily rambling," and he got up from the couch, walked over to her, and told her to give him the gun. Appellant described the operation of the revolver and stated that he previously had taught Spurgeon how to use it for her protection. He believed that the operator of the handgun had to "pull the hammer back." He explained that he did not know Spurgeon pulled the hammer back. Appellant said the gun was in Spurgeon's right hand because she was right-handed. He then described their positioning while they struggled for possession of the gun. He said they each were standing with both of their arms outstretched as he tried to twist the gun out of her hand. He said that when Spurgeon finally let go of the gun, it went off. He noted that they were never on the ground while they struggled over the gun. Most of what Appellant said next largely is incoherent. He claimed that all he could remember was that his ears were ringing. He lamented, "If I would have just left her alone." He then said that he got his phone, called his Mom, and said to her, "Mom . . . [makes gestures] . . . accident . . . [gestures] . . . [Spurgeon] shot." He said his mind shut down after his ears started ringing, explaining "everything just . . . stopped for me." He said he remembers "spots." Before ending the interview, Appellant stated, "I didn't shoot [Spurgeon]."

The autopsy confirmed that Spurgeon was killed by a "penetrating gunshot wound of [her] head," and her death was determined to be a homicide. There was extensive stippling to Spurgeon's face surrounding the gunshot wound. Dr. Priscilla Rogers, who performed the autopsy, testified at trial that the stippling patterns on Spurgeon's face indicated that she was shot at an intermediate range, which is up to two or three feet. The stippling patterns were concentrated on the left side of her face, her left arm, and her left forearm. Dr. Rogers further testified that Spurgeon suffered numerous skull fractures, including one at the base of the skull and at the back of her head, as well as extensive bleeding around her brain. She described a "wound trek" through the brain where the bullet traveled. She further described that the bullet's trajectory moved in a path from front to back, left to right, and in a slightly upward direction. She also performed a toxicology test on Spurgeon, which revealed that she tested positive for methamphetamine.

Dr. Rogers did not explain whether there "should have been" an exit wound; rather, she testified that there was no exit wound. She explained that the existence of an exit wound would depend on several factors, which include whether Spurgeon was placed against a hard surface at the time she was shot, what type of bullet was fired, and what body parts were in the wound path. Dr. Rogers did affirmatively testify that the skull fracturing did not appear to be caused by Spurgeon hitting her head on the ground while falling from a standing position after being shot, but rather offered her medical opinion that it was caused by the bullet itself. She also noted that she recovered eight, separate fragments of the bullet from the gunshot wound.

Texas Department of Public Safety Crime Laboratory Analyst Rebekah Lloyd conducted a gunshot residue (GSR) analysis, which showed that Appellant had six GSR particles on his right hand and one on his left hand. Lloyd testified that while a GSR test cannot definitively determine that a person fired a weapon, the presence of GSR indicates that the person either recently fired a weapon, was in the immediate proximity of a weapon which was fired, or came into contact with a surface containing GSR particles. She further testified that the gunshot victim is not typically tested for GSR because GSR is presumed to be on that person. Initially, the samples taken from Spurgeon at the hospital were not analyzed for GSR. However, both of her hands were swabbed in the hospital for GSR testing. Southwestern Institute of Forensic Services Trace Evidence Examiner Kialani Killinger ultimately tested Spurgeon's samples, and the results showed one particle of GSR was confirmed on the palm of her left hand.

Ranger Adcock testified that the photos of the crime scene led him to conclude that the shooting was a "low-spatter event." He noted that there was no blood spatter at any high point throughout the apartment, inferring that it was unlikely Spurgeon was standing when she was shot. Ranger Adcock also testified that he believed that when Spurgeon was shot, the back of her head was against a non-yielding surface like concrete. He testified that, in his experience, the type of bullet that was recovered from her skull would have exited out of her head had she not been against a hard surface. He also noted that the bullet fragmented into eight different pieces, which would mean that it "had to hit something hard" to disintegrate like that. He said that the material inside Spurgeon's skull would not cause the bullet to fracture like it did and fail to exit her skull. Ranger Adcock acknowledged on cross-examination that he did not locate any indentation in the linoleum kitchen flooring to support his theory that the unyielding, hard surface of the floor caused the bullet to fragment.

Ranger Adcock nevertheless said the evidence is not consistent with Appellant's story that he and Spurgeon were struggling over the gun while standing. He explained:

> There were several things that I questioned about that. One we've already talked about is the – what appeared to me was the low impact bloodstain all across the bottom of the refrigerator door. The big bloodstain that was in the middle of the linoleum floor, there were spatter stains that radiated from that main stain all over the floor going in different angular directions from that main stain.
>
> Take that into account with what I learned from the autopsy, you know, you have a penetrating gunshot wound which there was no exit wound – that's what that means – from a .357 magnum, which is a very powerful handgun. Usually you see an exit wound to the cranium. There's not a whole lot – you have your brain and water and tissue there that is absorbing all that energy and slowing that bullet down. And, normally, you see an exit in those type of gunshot wounds. This one, you did not.
>
> You had multiple skull fractures to the back of the head. It was a hollow point bullet, which is designed to – when it hits tissue and water, it expands, gets enlarged, and it disperses its energy as it slows down. It really does not fragment. But in this one – in this case, the bullet, when it was recovered from autopsy, was in eight different pieces. And that's just very unusual for this type of gunshot wound for the bullet to fragment. It had to hit something hard to disintegrate that bullet into eight different pieces.
>
> So in my determination since, one, it did not exit the back of her head, it fractured all of the back part of her skull, and the bullet fragment, in my opinion, it had – from my training and experience, the head had to be supported or shored up against a non-yielding surface like concrete or something to make that skull fracture in that event and the bullet to fracture in multiple pieces and not exit.

He also testified that the type of .357 magnum revolver used would require 3.5 pounds of pressure to fire in "single action" and ten pounds of pressure to fire if shot in "double action." In Ranger Adcock's opinion, if a single action had been used to fire the gun, the person who fired it would have had to pull back the hammer before firing, which would indicate the shooter acted with intention because it required both cocking the gun and pulling the trigger.

Ultimately, Ranger Adcock concluded that the evidence was inconsistent with Appellant's story that he and Spurgeon were wrestling over the gun in a standing position when it went off and shot her. Instead, he believed that the evidence was consistent with Appellant's committing an intentional or knowing act of causing Spurgeon's death by shooting her with a firearm.

**Discussion**

In contravention of Appellant's contention, we first note that the State is not required to prove that Appellant had a motive for killing Spurgeon. *See **Clayton v. State***, 235 S.W.3d 772, 781 (Tex. Crim. App. 2007) (stating that motive is not element of murder, although it may be a circumstance indicative of guilt). Moreover, the trial court may consider a defendant's untruthful

statements—whether "implausible" or "inconsistent"—as affirmative evidence of guilt. *See Gear v. State*, 340 S.W.3d 743, 745, 747–48 (Tex. Crim. App. 2011); *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (holding that making false statements to cover up crime is evidence indicating consciousness of guilt and is admissible to prove commission of offense); *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (holding that conduct after crime indicating defendant's consciousness of guilt is "one of the strongest kinds of evidence of guilt"). The trial court also was entitled to consider the defendant's "strange behavior" after the murder. *See Smith v. State*, 332 S.W.3d 425, 445-46 (Tex. Crim. App. 2011); *see also Spiers v. State*, 543 S.W.3d 890, 895 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). "Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

Appellant's mother testified that he told her, "I shot Brooke," which is consistent with the 9-1-1 call from Appellant's aunt, who stated that he told his mother that he shot his girlfriend. Appellant initially did not mention the shooting to the 9-1-1 dispatcher, but later said on the call that "she shot herself right in the forehead[.]" Only later, did Appellant describe the incident as an accidental shooting. Other evidence rationally could lead a factfinder reasonably to conclude that he acted intentionally or knowingly as the person who shot Spurgeon, and that this act resulted in her death. For example, the trial court could have considered the evidence that (1) Appellant refused to let anyone into the apartment until law enforcement arrived, (2) he waited for a minute after the shot before he ran out of his apartment, (3) a bullet of the same type as the one that shot Spurgeon was found in his pocket after the shooting even though the chamber was full, (4) Appellant and Spurgeon often argued, (5) Appellant lied to Ranger Adcock about whether they ever argued, (6) Appellant's version of how the shooting occurred was inconsistent with the blood spatter evidence and other forensic evidence, such as the fact that the bullet did not exit Spurgeon's skull, (7) he ran outside immediately after the shooting and said, "I'm sorry, babe," and (8) he was "agitated" with Spurgeon shortly before the shooting. Based on the foregoing, we conclude that a rational factfinder reasonably could infer that Appellant intentionally or knowingly shot Spurgeon, which resulted in her death. *See id.*

Furthermore, the trial court as factfinder could have presumed Appellant's intent because a firearm is a deadly weapon per se and the evidence supports that the firearm in this case was

14

used in a deadly fashion, which raises the inference of intent to kill. *See* TEX. PEN. CODE ANN. § 1.07(a)(17)(A) (West Supp. 2023) (defining firearm as a deadly weapon per se); *see **Staley v. State***, 887 S.W.2d 885, 889 (Tex. Crim. App. 1994) (noting that use of deadly weapon in deadly fashion raises inference that defendant intended to kill).

As to Appellant's remaining contention that the State failed to prove that the shooting was anything other an accident, we previously have noted that "accident" is not a defense to murder under Texas law. *See **Adanandus***, 866 S.W.2d at 229. Rather, the question of accident relates to the issue of whether the conduct was voluntary. *See id.* at 230. When evidence of an accident is raised at trial, the factfinder must find beyond a reasonable doubt that the defendant voluntarily engaged in the conduct of which he is accused. *See **Williams***, 630 S.W.2d at 644. "Voluntariness," as we have explained, refers only to one's own physical body movements. ***Whatley***, 445 S.W.3d at 166. If those physical movements are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis, or other nonvolitional impetus, such movements are not voluntary. *See id.*

As we explained above, when the evidence is viewed in the light most favorable to the State, the factfinder rationally could disbelieve Appellant's version of the events. Accordingly, we conclude that it likewise could disregard Appellant's contention that this shooting was accidental and, instead, reasonably could have found that he is the person who possessed the handgun and who intentionally or knowingly shot Spurgeon by his own voluntary, physical movement of pulling the trigger at an intermediate range. *See **Whatley***, 445 S.W.3d at 166; ***Adanandus***, 866 S.W.2d at 229.

In sum, we have concluded that a rational factfinder reasonably could infer that Appellant intentionally or knowingly shot Spurgeon, which resulted in her death or, alternatively, the trial court could have presumed Appellant's intent because a firearm is a deadly weapon per se and the evidence supports that the firearm in this case was used in a deadly fashion, which raises the inference of intent to kill. We further have concluded that, based on the evidence, the trial court reasonably found that Appellant acted in a voluntary manner. Accordingly, we hold that the evidence is legally sufficient to support the trial court's judgment beyond a reasonable doubt. We overrule Appellant's sole issue.

## DISPOSITION

Having overruled Appellant's sole issue, we ***affirm*** trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered May 8, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 8, 2024**

**NO. 12-23-00208-CR**

**CHRISTOPHER NELSON HOOD,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 173rd District Court

of Henderson County, Texas (Tr.Ct.No. CR21-0417-173)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED, and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*